**Electronically Filed
Supreme Court
SCWC-30485
02-MAY-2016
09:30 AM**

IN THE SUPREME COURT OF THE STATE OF HAWAIʻI

---o0o---

_____

CLARENCE O. FURUYA AND LONA LUM FURUYA,
Petitioners-Respondents/Plaintiffs-Appellees/Cross-Appellants,

vs.

ASSOCIATION OF APARTMENT OWNERS OF PACIFIC MONARCH, INC.; JAMES
DOZIER; GRETA WITHERS; ELWIN STEMIG; FOIL CRAVER; KAZUO SAWADA,
Respondents-Petitioners/Defendants-Appellants/Cross-Appellees.

_____

SCWC-30485

CERTIORARI TO THE INTERMEDIATE COURT OF APPEALS
(NO. 30485; CIV. NO. 06-1-1057)

MAY 2, 2016

RECKTENWALD, C.J., NAKAYAMA, McKENNA, POLLACK, AND WILSON, JJ.

OPINION OF THE COURT BY WILSON, J.

Petitioners-Respondents/Plaintiffs-Appellees/Cross-

Appellants Clarence O. Furuya and Lona Lum Furuya (the Furuyas)

and Respondents-Petitioners/Defendants-Appellants/Cross-

Appellees, Association of Apartment Owners of Pacific Monarch,

Inc. (AOAO) both filed applications for writ of certiorari.  The applications concerned various issues related to the Furuyas' interests in an apartment unit located at the Pacific Monarch Condominium (Pacific Monarch) and 106 parking stalls which are appurtenant to the unit.  We accepted both applications for writ of certiorari.  Below, we address the arguments raised in the Furuyas' application for writ of certiorari and for the reasons discussed herein, we affirm the Intermediate Court of Appeals' (ICA) judgment on appeal.  We do not address the arguments raised by AOAO in its application for writ of certiorari, as AOAO failed to demonstrate that the ICA erred.[1]

---

[1]    AOAO raised claims regarding: (1) the Furuyas' obligation to pay lease rent for the parking stalls after April 26, 2014, and (2) AOAO's use of two of the parking stalls without compensating the Furuyas.  As to AOAO's first claim, the ICA held that the circuit court did not err in interpreting the conveyance document from the developer to the initial lessees as indicating that the developer intended to give up its right to lease rent of the parking stalls after 2014.  Furuya v. Ass'n of Apartment Owners of Pac. Monarch, Inc., No. 30485, at 12-14 (App. Apr. 25, 2014) (mem.).  In addition, the ICA held that the Furuyas had no statutory obligation to pay lease rent. Id. at 18.  In regards to AOAO's second claim, the ICA held that the circuit court abused its discretion in estopping the Furuyas from seeking damages for AOAO's use of the two stalls after the filing of the Furuyas' initial complaint. Id. at 28.  The ICA's holdings were not erroneous.

We note that AOAO did not raise a claim to the ICA for unjust enrichment or quantum meruit based on the Furuyas' obligation to pay lease rent on the parking stalls after April 26, 2014. Id. at 16 n.11.  Our affirmance of the ICA's memorandum opinion does not address the merits of such a claim.

## I.    Facts

### A.    Background

The Pacific Monarch is a condominium project located in Honolulu, Hawaiʻi.  The AOAO of the Pacific Monarch was created to "provide the management, maintenance, protection, preservation, control and development" of the Pacific Monarch.  AOAO is governed by its Board of Directors (Board).  In 1979, apartment unit 3206 and the parking stalls were conveyed by Hasegawa Komuten (USA), Inc., the developer of the Pacific Monarch, to the initial lessees, via the Pacific Monarch Condominium conveyance document.  The Furuyas acquired the leasehold interest to apartment unit 3206 at the Pacific Monarch for $560,000 through a foreclosure sale in July 1985.  Pursuant to the original conveyance document, unit 3206 was conveyed to the original owners with several appurtenant easements, including an exclusive appurtenant easement to parking stalls 1 through 106 of the condominium.  The Furuyas acquired the leasehold interest in apartment unit 3207 in December 1989.

### B.    AOAO's Purchase of the Leased Fee Interest in the Condominium and the Furuyas' Execution of the DROAs

In 1995, AOAO, through the Board, sought to purchase

the leased fee interest[2] in the condominium from the lessor to offer the owners the opportunity to own the leased fee interests in their units.  To proceed with the purchase, the Board amended its Bylaws.  Article III of the amended November 14, 1995 Restated Bylaws conferred certain "powers and duties" to AOAO's Board, including, "Implementation of the Acquisition of the Leased Fee Interest in the Land from Lessor."  The Board was authorized and had the power to do all things it deemed necessary to enable the lessor to sell the leased fee interest to AOAO and/or its members.  The Bylaws further stated that on behalf of AOAO, the Board was authorized to purchase all or any portion of the leased fee interest in the land from the lessor and expressly authorized to transact any and all other matters relating to the acquisition.  The Board was also required to obtain agreement from owners who represented at least 75% of the common interest to (1) ratify AOAO's purchase of the leased fee interest, and (2) commit to and contract for the purchase of their leased fee interest.

As noted, the Furuyas owned a leasehold interest in unit 3206 and the appurtenant easement to the 106 parking

---

[2]     "If real estate is encumbered by a lease, the ownership interest in that property is considered a leased fee interest rather than a fee simple interest because 'the possessory interest has been granted to another party by creation of a contractual landlord-tenant relationship (i.e., a lease).'" Plaintiff's Proof of a Prima Facie Case § 7:2.50.

stalls, as well as a leasehold interest in unit 3207.  The Board sent the Furuyas a survey dated April 23, 1996 asking them to indicate whether they intended to purchase the leased fee interests in their two units and the parking stalls.[3]  The Furuyas signed the document, checking off a pre-printed line that stated, "YES, I plan to purchase my leased fee interest in Unit #3206 at $28,756.85, Unit #3207 at $28,756.85 and 106 Parking Stalls at $459,131.19."

On or around October 16, 1996, the Furuyas executed a document titled "Pacific Monarch Leased Fee Interest Sales Contract Deposit Receipt Offer and Acceptance" (DROA), in preparation for the bulk sale of a number of units in the condominium.  The Furuyas filled out and signed the portion of the DROA titled "Offer."  The Furuyas handwrote "3206" following the section stating, "[t]he buyer is buying the leased fee interest to the following apartment or commercial unit in the Pacific Monarch project."  Attached to the DROA was an exhibit indicating the prices for the various units.  Units 3206 and 3207 were priced at $28,756.85.  The 106 parking stalls were also included in the attached exhibit and priced at $459,131.19. The portion of the DROA titled, "Acceptance" stated, "The

---

[3]     The other condominium owners received similar surveys.  The survey stated, "This is NOT a contract for the purchase of your leased fee interest."

Association agrees to sell the Property to the Buyer or its designee at the price and upon the terms set forth herein, including the Additional Terms attached hereto."  The "Acceptance" portion provided a line for AOAO to sign as "Acceptance" of the DROA.  The DROA in the record was not signed by AOAO and there is no evidence in the record that AOAO ever signed the "Acceptance" portion of the DROA.  The Furuyas also signed a DROA for unit 3207.[4]

The DROAs for units 3206 and 3207 set the closing date for the acquisition of the leased fee interest for the two units as December 9, 1996.  In accordance with the instructions in the DROA, the Furuyas sent $1,000 per unit to open escrow for both units 3206 and 3207.  The purchase of the leased fee interest in unit 3207 closed with the bulk sale of the leased fee interests in a number of other units in the condominium on December 27, 1996.[5]

Although escrow was opened for the purchase of the leased fee interest in unit 3206 and the Furuyas deposited $1,000 into escrow with Title Guaranty of Hawaiʻi (Title Guaranty) for the unit, the sale of the leased fee interest in

---

[4]    The DROA for unit 3207 contained in the record is also not signed by AOAO.

[5]    The original closing date set in the DROA was extended until December 27, 1996.

unit 3206 was never closed.  The record does not contain a fully executed contract between the Furuyas and AOAO for the purchase of unit 3206 and/or the parking stalls.  The Furuyas did not fund the escrow account with payment of $28,756.85 for unit 3206 or $459,131.19 for the 106 parking stalls.

**C.    AOAO Retains Ownership of Unit 3206 and the Parking Stalls and Negotiations Regarding Sale of the Leasehold Interest in the Parking Stalls**

The heart of the dispute in this case is whether there was an enforceable contract for the purchase of the leased fee interest in unit 3206 and the parking stalls, and whether following the signing of the DROA, the Furuyas elected not to purchase the leased fee interest in the parking stalls.  The record indicates—and the Circuit Court of the First Circuit (circuit court) found—that very soon after the Furuyas signed the DROA for unit 3206, they informed AOAO that they did not want to purchase the leased fee interests in the parking stalls.  However, the Furuyas dispute this finding, and argue that AOAO refused to close because it determined it wanted to control the parking.  The relevant evidence regarding this issue is discussed herein.

Several AOAO representatives testified that well before the closing date set on the DROA, December 9, 1996,

Clarence Furuya (Furuya) informed AOAO Board members and Caesar Paet (Paet), a consultant at Cadmus Properties hired by AOAO to assist in the purchase of the leased fee interest from the lessor, that he no longer wanted to purchase the leased fee interest in the 106 parking stalls.[6] James Dozier (Dozier), AOAO treasurer, testified that "almost immediately Mr. Furuya indicated he would buy the fee to both Units 3206 and 3207 but would not buy the fee for the parking stalls." Dozier also testified that after Furuya indicated he did not want to purchase the parking stalls the Board decided it would be in its best interest to "buy the fee rather than sell it, to buy the parking stalls rather than sell [them]." Henry Foil Craver (Craver), an AOAO Board member, also testified that the Furuyas indicated they did not wish to purchase the leased fee interest in the parking stalls, and that he heard this information from Dozier. Specifically, Craver stated that Dozier spoke to Furuya, who told Dozier that he had "changed his mind and decided he didn't want to buy the fee" in the parking stalls. Similarly, Paet testified that Furuya informed him that he no longer wanted to buy the parking stalls, but he could not recall the timeframe of this communication.

---

[6]     Prior to trial, the parties took several depositions and designated portions of the testimony for trial. The deposition designation testimony was received into evidence by the circuit court on June 24, 2009.

AOAO representatives also testified that after signing the DROA, the Furuyas informed AOAO that they wanted to sell the leasehold interest to the 106 parking stalls to AOAO. Craver testified that Furuya "decided that he wanted to sell the parking stalls" and Paet stated that Furuya made an offer to AOAO to sell the parking stalls. The record contains written offers to sell the parking stalls to AOAO from Furuya's agent. On or around October 29, 1996—around two weeks after Furuya signed the DROA—Jason Lum (Lum), Furuya's real estate broker, sent a written offer to AOAO to sell the Furuyas' leasehold interest to 81 parking stalls for $1,215,000. Around two weeks later, on November 15, 1996, Lum sent a second written offer to the Board to sell all 106 stalls to AOAO for $1,166,000, and provided specific financing terms for the sale of the parking stalls. At trial, however, Furuya disclaimed his involvement in the written offers sent from Lum to AOAO and testified that he never wanted to sell the parking stalls.[7]

The record indicates that because the Furuyas decided not to purchase the leased fee interest in the parking stalls, AOAO determined that it was in its interest to retain ownership in the parking stalls and purchase the leasehold interest from

---

[7] The circuit court found Furuya's testimony not credible, as noted infra.

the Furuyas.  To finance the purchase of the parking stalls, AOAO issued a special assessment of $55 per month to all of the apartment owners.

The Furuyas' apparent decision not to purchase the leased fee interest in the parking stalls, AOAO's subsequent decision to retain ownership of the parking stalls, and the negotiations regarding the sale of the leasehold interest in the parking stalls from the Furuyas to AOAO were memorialized in internal and external AOAO documents.  In a November 6, 1996 meeting, AOAO discussed "the parking owner's decision not to purchase the fee interest in the parking."  At the meeting, Dozier reported that Furuya was interested in selling the leasehold interest in 81 of the parking stalls to AOAO and "recommended negotiating with the parking owner for the sale of all the parking stalls."  On December 19, 1996, Galen Leong (Leong), an attorney at Ashford & Wriston, LLP, wrote to Michael Peitsch at Title Guaranty, regarding the Furuyas' decision not to purchase the parking stalls, noting, "[t]he owners of Apartment 3206 have indicated that they wish to buy the leased fee interest in Apartment 3206 but not the leased fee interest in the parking stalls which are appurtenant to Apartment 3206."  AOAO Board President, Elwin Stemig (Stemig), in a January 14,

10

1997 letter to the condominium owners, explained the situation regarding the parking stalls:

> When the owners approved the [AOAO] Board's decision to purchase the fee interest to the land on which the Pacific Monarch building rests, this also included purchasing the fee interest for the 106 parking stalls in the parking garage.  Since the [AOAO] purchased the fee interest, <u>the owner of the 106 parking stalls has decided not to purchase his fee interest from the [AOAO]</u>.  The cost to the [AOAO] for the fee interest to the parking stalls was $422,000.  Thus the [AOAO] was faced with a decision as to whether to retain the parking fee interest to the 106 parking stalls or to sell it to an outside party.  The Board made the decision to retain the fee simple interest to the parking stalls and set a goal to eventually purchase all the 106 parking stalls from the present owner and operate the parking garage to generate extra income to the [AOAO].  At this stage it became necessary for the Board to levy a special assessment to payoff the extra expense of $422,000.  It will take approximately four years to payoff this debt.
>
> At this time the owner of the 106 parking stalls in the parking garage operates the garage and receives the revenue therefrom but pays lease payments to the [AOAO] since the [AOAO] now owns the fee interest to the 106 parking stalls.  The owner of the parking stalls has indicated an interest in selling same [sic] to the [AOAO] <u>since he did not choose to buy the fee interest to the parking stalls</u>.  Thus the Board intents [sic] to negotiate with the parking stalls owner to buy the stalls sometime within the next year.

(Emphases added).

As noted by Stemig, and according to Furuya's trial testimony, Furuya started to pay lease rent to AOAO for the parking stalls following AOAO's purchase of the leased fee interest in the parking stalls.  Notably, according to Furuya's account summary provided by AOAO, Furuya also paid the $55 a month assessment for the parking stalls between January 1, 1997 through December 31, 1999.

11

D.    **Attempt to Separate the Interests in Unit 3206 and the Parking Stalls**

Following the Furuyas' apparent decision not to purchase the parking stalls, it appears that AOAO and the Furuyas negotiated to separate the leased fee interests in unit 3206 and the parking stalls, in order to allow the Furuyas to purchase the leased fee interest in unit 3206 only.  In the letter from Leong to Title Guaranty, referenced above, Leong explains that selling the leased fee interest to unit 3206 and not the leased fee interest to the parking stalls, without separating them, would be impossible under the condominium conveyance document because "[a]partment 3206 and the parking stalls which constitute its limited common elements must be treated as undivided parts of a whole."  Leong stated that the parking stalls should be separated from the unit and proposed different methods of accomplishing the separation.  On March 27, 1997, Paet sent a fax to Alfred Hee, an attorney for AOAO, informing him that Lum, the Furuyas' broker, agreed to separating the parking stalls from unit 3206.  The document noted that "[i]n order to convey the fee interest for unit #3206, the parking stall interest must be separated from the apartment."  In the document, AOAO indicated that it "[would] handle the separation of interests at its' [sic] expense."  A

12

fax from Lum to Paet on March 31, 1997, provided that "Mr. Furuya is in agreement to separate the apartment and parking interest for unit 3206."

### E.    Continued Negotiations Regarding the Parking Stalls and 2003-2004 Communications

Between 1997 and 2004, the record indicates that AOAO and the Furuyas continued to negotiate AOAO's purchase of the leasehold interest in the parking stalls and the sale of the leased fee interest in unit 3206 to the Furuyas.  For example, the Board's December 18, 2000 and February 12, 2001 meeting minutes note that the Board's attorney was "in the process of drawing up the legal paperwork for Clarence Furuya to sign to swap the parking stalls" and that the attorney was "working on the sale of the fee for unit 3206," respectively.  However, the Furuyas and AOAO did not reach an agreement on either issue.

On September 11, 2003, Title Guaranty sent a letter to the Furuyas noting that escrow for unit 3206 had been opened "on or about October 21, 1996," but that they had not "received the seller's signed contract" and had not been instructed to close escrow.  Approximately two months later, on December 1, 2003, Furuya sent a letter to AOAO in order to complete the purchase from AOAO of the leased fee interest in unit 3206 and the parking stalls.  Furuya claimed in the letter that he contracted

13

with AOAO for the purchase of the leased fee interest in unit 3206, paid his deposit, and escrow had been opened for the unit. He explained that escrow was never closed and AOAO refused to allow him to purchase the leased fee interest for unit 3206 and the parking stalls attached to the unit. Furuya then proposed in the letter that AOAO allow him to purchase unit 3206 for $28,756.85 and the parking stalls for $459,131.19, the original pricing included in the 1996 DROA. In return, Furuya stated that he would not pursue a cause of action against AOAO for "willfully delaying the closing of escrow for unit 3206 and the purchase of the fee interest of the parking stalls attached to the unit." He also stated that if AOAO pursued the purchase of the leasehold interest in the parking stalls from the Furuyas, it would cost AOAO over $2,000,000.

AOAO's attorneys responded in a December 23, 2003 letter to Furuya and explained AOAO's version of the events. The letter stated that Furuya was "given the opportunity to buy the leased fee interest" in the parking stalls in 1996, but that he refused to buy the parking stalls and only wanted the leased fee interest in units 3206 and 3207. According to AOAO's attorneys, the sale of unit 3206 was never finalized because "the Association learned that the 106 parking stalls were

14

attached to unit 3206 and if the Association sold [the Furuyas] the leased fee interest to unit 3206" the Furuyas would in effect be purchasing the leased fee interest to the 106 parking stalls while only paying the cost of the leased fee interest for unit 3206. AOAO stated in the letter that it investigated a legal procedure to sever the 106 parking stalls from unit 3206 to enable the Furuyas to purchase only the leased fee interest to unit 3206.

The letter also stated that AOAO expressed an interest in purchasing from the Furuyas their leasehold interest in the parking stalls and began negotiations to purchase the parking stalls. The letter indicated that because the Furuyas countered with a "much too high price," AOAO continued to negotiate for the purchase of the parking stalls and at that point also negotiated to purchase unit 3206. The letter stated that after three meetings, no agreement could be reached. According to AOAO, at the last of the meetings, the Furuyas told AOAO that they wanted to purchase the leased fee interest to the 106 parking stalls, and that at this time, AOAO informed the Furuyas that they no longer wanted to sell the leased fee interest in the parking stalls. AOAO informed the Furuyas that it continued to be interested in purchasing the leasehold interest in the

15

parking stalls "with or without unit 3206."

On or around December 10, 2004, Furuya sent a letter to Title Guaranty Escrow Services canceling the escrow for unit 3206 and requesting that his $1,000 deposit be returned.

## F.   Furuya's Trial Testimony

On June 22, 2009, Furuya testified at trial as to his understanding of the sale of the leased fee interest in unit 3206 and the parking stalls.  He testified that he had been ready to close on unit 3206 when Dozier informed him that AOAO would not be able to close unit 3206 because it had to separate the apartment from the parking stalls.  Furuya testified that Dozier told him not to be concerned about the closing date.  He stated that he could understand the need to separate the unit from the parking stalls because otherwise, he would own the fee in unit 3206 and the parking stalls while paying only for unit 3206.  Furuya contended that later, AOAO approached him about purchasing his leasehold interest in the parking stalls.  Furuya claimed that although Lum was his principal broker and authorized to look for real estate deals for him, he did not ask Lum to sell the leasehold interest to the parking stalls.  He maintained that he always intended to close on unit 3206 and the parking stalls, but that he did not fund escrow because Dozier

16

had informed him that they needed to separate the parking stalls from the unit.

## II.  Procedural History

### A.  Circuit Court Proceedings

The Furuyas filed their initial complaint against AOAO in June 2006.  On November 30, 2007, the Furuyas filed their first amended complaint ("Complaint" or "FAC") alleging thirteen counts against AOAO.[8]  Relevant here, the Furuyas alleged breach of contract by AOAO seeking damages and specific performance; promissory estoppel based on AOAO's alleged promise to sell the Furuyas the unit and parking stalls; and declaratory relief, injunctive relief, and ultra vires actions, in relation to AOAO's retention of the leased fee interest in unit 3206.  AOAO

---

[8]     The Furuyas asserted the following thirteen counts against AOAO in their first amended complaint: Count I—breach of contract (relating to AOAO's refusal to sell the leased fee interest in unit 3206 and the parking stalls to the Furuyas); Count II—specific performance; Count IV—injunctive relief (seeking an injunction barring AOAO from selling the Furuyas' interest to a third party); Count V—declaratory judgment (seeking, among other things, a declaration that the Furuyas "have no obligation to pay lease rent on the parking stalls after 2014"); Count VI—promissory estoppel (claiming that the Furuyas detrimentally relied on AOAO's promises to convey the leased fee interest to the Furuyas); Count VII—equitable estoppel (claiming that the Furuyas detrimentally relied upon AOAO's assurances that the Furuyas would be entitled to purchase the leased fee interests and AOAO's conduct in assisting other apartment owners in purchasing their respective fee interests); Count IX—ultra vires actions (claiming that AOAO does not have the right under the declaration and bylaws "to hold and maintain parking stalls in its own name in derogation of the rights of the individual unit owners"); Count X—unjust enrichment (claiming that AOAO would be unjustly enriched if it were allowed to retain the leased fee interest to unit 3206 and the parking stalls); and Count XI—conversion (claiming that AOAO converted some of the parking stalls).

Counts III, VIII, XII, and XIII were dismissed prior to trial.

17

filed an answer to the Furuyas' Complaint.  In relevant part, AOAO averred that the Furuyas and AOAO entered into negotiations for the purchase by AOAO of the leasehold interest in the 106 parking stalls because the Furuyas only wanted to purchase the leased fee interest to unit 3206, but not the 106 parking stalls.

The case was tried without a jury.  Prior to trial, and as discussed supra, the parties conducted several depositions, portions of which were stipulated into evidence at trial.  Furuya also testified at trial.  On June 24, 2009, after the Furuyas' case-in-chief, AOAO moved the court for a directed verdict pursuant to Hawaiʻi Rules of Civil Procedure (HRCP) Rule 41(b) (2009).[9]

The circuit court orally ruled that it would treat AOAO's motion as a motion to dismiss, and would therefore consider the evidence in the light most favorable to the nonmoving party, the Furuyas.  The court concluded that the DROA was not an enforceable contract and entered an order dismissing the Furuyas' breach of contract claims.  The circuit court also dismissed the Furuyas' declaratory relief, injunctive relief,

---

[9]    HRCP Rule 41(b) is titled "Involuntary dismissal: Effect thereof" and provides for dismissal "[f]or failure of the plaintiff to prosecute or to comply with these rules or any order of court, a defendant may move for dismissal of an action or of any claim against it."

18

ultra vires, promissory estoppel, and equitable estoppel claims at this time.  Of relevance here, the court noted that there was no reasonable reliance on the part of the Furuyas to justify their claims for promissory and equitable estoppel and that AOAO's actions did not justify the injunctive relief, ultra vires, and declaratory relief claims.

The claims remaining from the Furuyas' Complaint related to 1) the Furuyas' allegation that they did not have an obligation to pay lease rent for the parking stalls after the year 2014; and (2) the Furuyas' unjust enrichment claim, specifically, the Furuyas' allegation that they were entitled to damages for the alleged unauthorized use of two parking stalls that were assigned as laundry facilities.  Trial continued on the foregoing issues, and the circuit court entered its Findings of Fact and Conclusions of Law on March 2, 2010 ("March 2 FOF/COL").  The March 2 FOF/COL explicitly stated that the Findings of Fact and Conclusions of Law related only to the remaining claims from the Furuyas' Complaint, namely whether the Furuyas had an obligation to pay lease rent for the parking stalls and whether the Furuyas were entitled to damages for alleged unauthorized use of two of the parking stalls.

## B. The Furuyas' Appeal to the ICA[10]

On appeal to the ICA, the Furuyas argued that the circuit court failed "to find facts specifically and to state conclusions separately as required by HRCP Rule 52 in granting in part the AOAO's HRCP Rule 41(b) motion." The Furuyas argued that the entire order failed to meet the standard of providing findings and conclusions and thus, made it impossible to determine what facts and law the trial court used in making its "clearly erroneous decision."

The Furuyas also maintained that the circuit court was clearly erroneous in granting AOAO's HRCP Rule 41(b) motion. Relevant here, the Furuyas argued that the circuit court erred in finding and concluding that the DROA was not an enforceable contract. In this respect, the Furuyas claimed that the circuit court's findings that unit 3206 was offered to the Furuyas but that the DROA did not constitute an enforceable contract were "impossible to reconcile." They maintained that the DROA was AOAO's offer, while the Furuyas' execution and return of this DROA constituted their acceptance. The Furuyas contended that AOAO admitted in a deposition that the parties had "made the

_____

[10] AOAO cross-appealed. The only issue relevant on certiorari included in AOAO's cross-appeal involves its claim that the circuit court and the ICA erred in concluding that the Furuyas owe no rent to AOAO for the parking stalls after 2014. As noted <u>supra</u>, this issue is not addressed in this opinion.

deal," and that AOAO admitted in its Answer to the Furuyas' Complaint that it had accepted the DROA, escrow had opened, and earnest money had been deposited. Relatedly, the Furuyas claimed that AOAO's Restated Bylaws required AOAO to sell unit 3206 to the Furuyas, and that AOAO had failed to do so. The Furuyas also argued that any contention that there was no "meeting of the minds" concerning the sale of the leased fee interests to unit 3206 because the Furuyas refused to purchase the leased fee interest to the parking stalls was without merit and that they were ready, willing, and able to perform on the contract. The Furuyas contended that there is no separate leased fee interest for the 106 parking stalls because they are limited common elements appurtenant to a unit; the parking stalls were not themselves a unit.

As to the Furuyas' declaratory relief, injunctive relief, and ultra vires claims, the Furuyas argued that pursuant to AOAO's Restated Bylaws, AOAO was "required to sell the leased fee" to the Furuyas and "[had] no authority to retain the leased fee interest." The Furuyas also claimed that the circuit court erred in dismissing their promissory estoppel claim because all of the elements of promissory estoppel had been satisfied.

AOAO argued the following in response to the Furuyas'

breach of contract claim: (1) the Furuyas were not ready, willing, and able to close on unit 3206; (2) the DROA was not an enforceable contract; and (3) AOAO did not prevent the Furuyas from closing. In addition, AOAO disputed the Furuyas' contention that the 106 parking stalls did not have a leased fee interest separate and apart from unit 3206. AOAO argued that the 106 parking stalls are an undivided interest in the land leased by the Furuyas separate and apart from their leasehold interest in unit 3206.

As to the Furuyas' injunctive relief, declaratory relief, and ultra vires claims, AOAO argued that AOAO could retain possession of the leased fee interest in the unit because its actions were supported by the Bylaws and by statute. AOAO also claimed that the Furuyas' promissory estoppel claim was correctly dismissed because the Furuyas voluntarily decided not to close on the purchase of unit 3206.

C. The ICA's Temporary Remand

On October 25, 2012, the ICA issued an order for temporary remand to the circuit court. The ICA held that pursuant to HRCP Rule 52(a) (2006), the circuit court was required to support its partial dismissal order with findings of fact and conclusions of law. The ICA further held that although

the circuit court dismissed a number of the Furuyas' claims pursuant to HRCP Rule 41(b), the ruling should be considered to be made pursuant to HRCP Rule 52(c).  The ICA noted that pursuant to HRCP Rule 52(c), "[i]f, as here, after a bench trial where a party has been fully heard on an issue, the court enters judgment as a matter of law, that judgment shall be supported by findings of fact and conclusions of law."  The ICA thus temporarily remanded the case to the circuit court for entry of findings of fact and conclusions of law to support its dismissal of the counts in the Furuyas' Complaint.

**D.   The Circuit Court's December 21, 2012 Findings of Fact and Conclusions of Law**

Pursuant to the ICA's order for temporary remand, the circuit court issued its Findings of Fact and Conclusions of Law in support of its Order partially dismissing the following counts alleged by the Furuyas in their Complaint: breach of contract seeking damages and specific performance, injunctive relief, declaratory relief, promissory estoppel, equitable estoppel, ultra vires act, and conversion.

Regarding the breach of contract claim, the circuit court determined that the DROA constituted an "offer" to AOAO for the purchase of the leased fee interests to unit 3206 and the appurtenant parking stalls; however, the circuit court found

23

that the DROA was never signed by AOAO nor was it ever modified or amended. The circuit court thus concluded that no enforceable agreement existed between the Furuyas and AOAO as to the sale of the leased fee interest in unit 3206 or the appurtenant parking stalls because there was neither an acceptance by AOAO of the written agreement for the unit or stalls, nor was there a meeting of the minds as to the sale of the unit and stalls.

The circuit court also determined that the Furuyas decided not to purchase the leased fee interest in the parking stalls soon after executing the DROA, and accordingly, did not fund the escrow account with the payment for unit 3206 or the parking stalls. The following Findings of Fact are relevant to this issue:

> 54. The closing documents for Apartment Unit 3207 were executed on or about December 13, 1996, and the deed was recorded on December 27, 1996.
>
> 55. The FURUYAS did not fund the escrow account with the payment of $28,756.85 for Apartment 3206.
>
> 56. The FURUYAS did not fund the escrow account with the payment of $459,131.19 for the 106 Parking Stalls.
>
> 57. There is no sales contract for the FURUYAS['] purchase of the leased fee interest for the Apartment Unit 3206 and the appurtenant 106 Parking Stalls.
>
> 58. CLARENCE FURUYA did not ask for an extension of the closing date for the purchase of the leased fee interests for Apartment 3206 or the 106 Parking Stalls.
>
> 59. Shortly after executing the DROAs, the FURUYAS decided that they did not want to purchase the leased fee interests

24

to the 106 Parking Stalls.

60. Well before the December 9, 1996, closing date, CLARENCE FURUYA informed the AOAO's Board members and its Lease-to-Fee Conversion Consultant, Caesar Paet, that the FURUYAS no longer wanted to acquire the leased fee interest to the 106 Parking Stalls.

61. Because of the FURUYAS['] decision to not purchase of [sic] the leased fee interest to the Parking Stalls and decision to sell the Parking Stalls to the AOAO, there was no closing on the sale of the leased fee interests to Apartment 3206 or the 106 Parking Stalls to the FURUYAS.

62. CLARENCE FURUYA did not request Title Guaranty to keep escrow opened so he could complete the purchase of the leased fee interest.

. . . .

77. After the FURUYAS decided that they did not want to acquire the leased fee interest in the 106 Parking Stalls, CLARENCE FURUYA informed several [of] AOAO's Board members and Ceasar [sic] Paet that he wanted to sell the leasehold interest to the 106 Parking Stalls to the AOAO.

78. The FURUYAS' decision to not close on the purchase of the leased fee interests was reported to other third-parties evaluating to sale [sic] of the leasehold interests to the Parking Stalls. Attorney Galen Leong of Ashford & Wriston wrote to Michael Peitsch at Title Guaranty of Hawaiʻi about the FURUYAS' decision not to purchase of [sic] the leased fee interests for Apartment Unit 3206 and the appurtenant 106 Parking Stalls.

79. The FURUYAS informed the AOAO that they wanted to sell the leasehold interest to the 106 Parking Stalls to the AOAO.

. . . .

86. On or about October 29, 1996, the FURUYAS submitted a written offer to the AOAO to sell to it the leasehold interest to 81 parking stalls for $1,216,000 [sic].

87. The [] written offer to the AOAO to sell the leasehold interest to 81 parking stalls for $1,216,000 [sic] to the AOAO was prepared and sent by the FURUYAS' princip[al] real estate broker, Jason Lum.

. . . .

91. Lum had no independent authority to offer to sell or to sell or to negotiate to sell any of CLARENCE FURUYA's properties.

. . . .

93. As reflected in the minutes of the November 1996 Board of Directors' meeting, the written offer by CLARENCE FURUYA was considered and discussed by the AOAO's Board:

> There was a discussion over the parking owner's decision not to purchase the fee interest in the parking. Jim Dozier noted that the parking owner is interested in selling 81 of the parking stall [sic] to the AOAO. Jim recommended negotiating with the parking owner for the sale of all the parking stalls. . . There was further discussion over the AOAO holding on to the fee simple title in the parking stall and extensive discussion over financing of the purchase of the AOAO's reserves rather than including it in the AOAO's bank loan. . . .

94. On or about November 15, 1996, CLARENCE FURUYA submitted another written offer to the AOAO for the sale of all 106 Parking Stalls to the AOAO for $1,166,000.

95. This November 15, 1996 offer to sell all 106 Parking Stalls to the AOAO provided specific financing terms for the sale of the Parking Stalls.

96. CLARENCE FURUYA's trial testimony that he had nothing to do with the written offers to sell the 106 Parking Stalls and he "absolutely did not offer to sell the parking stalls to the AOAO" is not credible.

(Record citations omitted).

The circuit court also concluded in its Findings of Fact that "[a]ny delay in [the] closing of Apartment Unit 3206 was not caused by the AOAO's failure to take steps to separate the leasehold interest in the 106 Parking Stalls from the leasehold interest in the Apartment Unit 3206" and relatedly,

26

that "[t]he separation discussion was not the reason that prevented the FURUYAS from closing on the sale of the leased fee interests to the apartment unit and the Parking Stalls."

The circuit court entered the following related Conclusions of Law:

> 15. There was no acceptance by the AOAO of an [sic] written agreement for the sale of the leased fee interests in the 106 Parking Stalls after the FURUAYS [sic] decided not to purchase the leased fee interest to the 106 Parking Stalls and decided not to close on the purchase of the leased fee interests for Apartment Unit 3206 and the 106 Parking Stalls.
>
> 16. There was no meeting of the minds between Plaintiffs and the AOAO as to the sale of the leased fee interests for the Apartment Unit 3206 and the Parking Stalls.
>
> 17. "[I]f a promisor himself is the cause of the failure of performance * * * of a condition upon which his own liability depends, he cannot take advantage of the failure. . . . [N]o one can avail himself of the non-performance of a condition precedent, who has himself occasioned its non-performance. . . . The doctrine is purely one of waiver. . . ." See Ikeoka v. Kong, 47 Haw. 220, 228[,] [386 P.2d 855, 860] (1963).
>
> 18. The DROA for Unit 3206 did not create a contract with the AOAO for the purchase of the leased fee interests to the 106 Parking Stalls.
>
> 19. The DROA for Unit 3206 executed by CLARENCE FURUYA is not an enforceable agreement against the AOAO for the purchase of the leased fee interests to Apartment Unit 3206 and the appurtenant 106 Parking Stalls.
>
> 20. There was no meeting of the minds between the FURUYAS and the AOAO as to the FURUYAS['] purchase of the leased fee interests to the Apartment Unit 3206 and the appurtenant 106 Parking Stalls.
>
> . . . .
>
> 27. The termination of the escrow for the DROA by the FURUYAS effectively terminated any alleged offer for the purchase of the leased fee interests in the Apartment Unit 3206 and the Parking Stalls.

27

. . . .

30. The "failure by the party seeking to establish the enforceability in equity of a contemplated contract, to show his ability, readiness and willingness to perform essential acts required or obligations incurred therein, reflects in itself a fundamental lack of mutuality." Molokai Ranch v. Morris, [36 Haw. 219, 228 (Haw. Terr. 1942)].

31. The maxim "He who seeks equity must do equity," bars the FURUYAS' request for specific performance. See 2 A. Corbin, *Corbin on Contracts* § 310 at 44 (1950 & Supp. 1992[)] ("[I]t is well-recognized that []no [person] should profit by his [or her] own wrong."); Adair v. Hustace, 64 Haw. 314, 320[,] [640 P.2d 294, 300 (1982)] (The doctrine of laches reflects the equitable maxim that "equity aids the vigilant, not those who slumber on their rights." []).

(Record citations omitted).

With respect to the remaining claims addressed in the circuit court's December 21, 2012 Findings of Fact and Conclusions of Law, the court held as follows: 1) the Furuyas could not recover based on their promissory estoppel or equitable estoppel claims because there was no reasonable reliance; 2) the Furuyas' injunctive relief, declaratory relief, and ultra vires act claims failed because AOAO acted within its authority by retaining the leased fee interests in the unit and the parking stalls, and there was no enforceable agreement.

**E.    Supplemental Briefs to the ICA**

The Furuyas and AOAO submitted supplemental briefing to the ICA regarding the circuit court's December 21, 2012 Findings of Fact and Conclusions of Law.  The parties in large part reiterated the arguments in their original briefings to the

28

ICA.  The Furuyas and AOAO continued to dispute the following issues: (1) the existence of an enforceable contract for the leased fee interest for unit 3206 and the appurtenant 106 parking stalls; (2) whether the parking stalls had a leased fee interest separate and apart from the leased fee interest of unit 3206; and (3) AOAO's obligation to sell unit 3206 and the parking stalls pursuant to its governing documents.

**F.    ICA Memorandum Opinion**

The ICA held that the circuit court did not err in concluding there was no enforceable contract between AOAO and the Furuyas for the purchase of the leased fee interests associated with unit 3206 and the parking stalls.  Furuya v. Ass'n of Apartment Owners of Pac. Monarch, Inc., No. 30485, at 18-21 (App. Apr. 25, 2014) (mem.).  According to the ICA, under the plain language of the DROA, Furuya was making an offer that AOAO "would ultimately have to accept" to create a binding contract.  Id. at 19.  The ICA found that AOAO had not signed the DROA on the designated acceptance line of the document; therefore, the circuit court had not erred in concluding that the DROA for unit 3206 was not a binding contract.  Id.  The ICA also rejected the Furuyas' claim that AOAO admitted acceptance of the offer in previous pleadings, determining that the Furuyas waived the argument because it was not raised below and the

29

issue of whether the contract was enforceable was disputed at trial.  Id.  at 21.

As to the Furuyas' injunctive relief, declaratory relief, and ultra vires claims, the ICA determined that the circuit court did not err in dismissing the claims because AOAO's Restated Bylaws did not require "the AOAO to offer, or to not retain, the leased fee interest."  Id. at 22.  The ICA held that the Furuyas' promissory estoppel claim was properly dismissed by the circuit court for lack of "reasonable reliance by the Furuyas on any promise by the AOAO."  Id. at 23.

### III. Standard of Review

**A.   Order Granting Partial Dismissal Pursuant to HRCP Rule 52(c)**

The ICA concluded in its order for temporary remand to the circuit court that although the circuit court dismissed several of the Furuyas' claims pursuant to HRCP Rule 41(b), the ruling should be considered made pursuant to HRCP Rule 52(c). The parties do not dispute the ICA's determination.

As the ICA determined, "[w]here we have patterned a rule of procedure after an equivalent rule within the FRCP [Federal Rules of Civil Procedure], interpretations of the rule by the federal courts are deemed to be highly persuasive in the reasoning of this court."  Furuya, mem. op. at 10 (quoting

30

<u>Kawamata Farms, Inc. v. United Agri Prods.</u>, 86 Hawaiʻi 214, 251–52, 948 P.2d 1055, 1092–93 (1997)).  HRCP Rule 52(c) was modeled after FRCP Rule 52(c).  <u>See</u> Hawaiʻi Rules Committee, Proposed Red-Line Rules and Commentary to the Hawaiʻi Rules of Civil Procedure, Rules Committee Notes to Rules 41 and 52 (July 23, 1997).  The United States Court of Appeals for the Ninth Circuit has held that "[i]n reviewing the district court's judgment entered under Rule 52(c), we review its findings of fact for clear error and its conclusions of law <u>de novo</u>."  <u>United Steel Workers Local 12-369 v. United Steel Workers Int'l</u>, 728 F.3d 1107, 1114 (9th Cir. 2013).  The court also noted that "in the context of a bench trial . . . '[i]f the district court's account of the evidence is plausible in light of the record reviewed in its entirety, [we] may not reverse it even though convinced that had [we] been sitting as the trier of fact, [we] would have weighed the evidence differently.'"  <u>Id.</u> (alteration in original) (citation omitted).

B.  **Findings of Fact and Conclusions of Law**

A finding of fact is clearly erroneous "when the record lacks substantial evidence to support the finding" or when "despite evidence to support the finding, the appellate court is left with the definite and firm conviction in reviewing

31

the entire evidence that a mistake has been committed." Bhakta v. Cty. of Maui, 109 Hawaiʻi 198, 208, 124 P.3d 943, 953 (2005) (citation omitted). Conclusions of law are reviewed under the right/wrong standard. Estate of Klink ex rel. Klink v. State, 113 Hawaiʻi 332, 351, 152 P.3d 504, 523 (2007). A conclusion of law that presents a mixed question of law and fact is reviewed under the clearly erroneous standard. Id.

### IV. Discussion

On certiorari, the Furuyas maintain their position that the DROA constituted an enforceable contract for the purchase of unit 3206 and the 106 parking stalls. The Furuyas additionally argue that the ICA gravely erred by sua sponte determining that AOAO's Bylaws did not require that AOAO offer the leased fee interest to the lessees; concluding that the Furuyas waived their argument that AOAO admitted there was a contract; and affirming the circuit court's promissory estoppel ruling. In response, AOAO claims that there was no enforceable contract because AOAO never "accepted" the DROA; AOAO's possession of the leased fee interests is not prohibited by the Bylaws; and there was substantial evidence to support dismissal of the promissory estoppel claim.

A.    **Breach of Contract Claims**

The main issue on appeal relates to the Furuyas'
claims for specific performance and damages based on their
contention that AOAO breached the DROA by failing to sell the
Furuyas unit 3206 and the parking stalls.  Throughout the
litigation, the Furuyas have maintained that the DROA for unit
3206 sent to the Furuyas constituted an offer; the Furuyas'
signature of the DROA constituted acceptance; and AOAO breached
the contract by refusing to sell the Furuyas the leased fee
interest in unit 3206 and the parking stalls.  The circuit court
rejected the Furuyas' argument, concluding that the DROA did not
create "an enforceable agreement against the AOAO for the
purchase of the leased fee interests to Apartment Unit 3206 and
the appurtenant 106 Parking Stalls."  The ICA agreed with the
circuit court, determining that the court did not err in finding
that AOAO "did not accept the DROA" and "in finding that the
Furuyas unsuccessfully attempted to purchase the fee interest
for 3206 without the parking stalls."  Furuya, mem. op. at 19.

The circuit court also noted in its Conclusions of
Law, however, that "[i]f a promisor himself is the cause of the
failure of performance [] of a condition upon which his own
liability depends, he cannot take advantage of the failure" and

33

a party seeking equity for a breach of contract claim must demonstrate "ability, readiness and willingness to perform." Relatedly, the court determined that "[t]he maxim '[h]e who seeks equity must do equity,' bars the FURUYAS' request for specific performance." (Citations omitted). As intimated by the circuit court, whether or not there was a valid and enforceable contract, specific performance will not be granted where the party fails to demonstrate that he or she was ready, willing, and able to perform on the contract throughout the contract term; and a party seeking damages cannot recover where the party is responsible for the breach. Here, in its Findings of Fact, the circuit court determined that the Furuyas decided not to purchase the leased fee interest to the parking stalls and that because of this decision, the DROA for apartment unit 3206 and the parking stalls never closed. The circuit court's findings are supported by substantial evidence and are not clearly erroneous. Thus, notwithstanding the Furuyas' claim that the DROA constituted an enforceable contract for unit 3206 and the parking stalls, their claims are barred because, pursuant to the circuit court's findings, their decision not to purchase the parking stalls after executing the DROA demonstrated that they were not ready, willing, and able to

34

perform on the contract; and relatedly, the Furuyas were responsible for the failure of the DROA to close.  Because the circuit court's findings in this regard were not clearly erroneous, the circuit court did not err in rejecting Furuyas' breach of contract claims.

It is a well-established principle of contract law, and recognized in our jurisdiction, that when seeking specific performance for a contract involving land, "to obtain relief, plaintiffs must show that they were ready, willing, and able to perform their obligations."  71 Am. Jur. 2d Specific Performance § 131 (2015); see also Kalinowski v. Yeh, 9 Haw. App. 473, 478-79, 847 P.2d 673, 677 (1993) (noting that purchasers were ready, willing, and able to perform all their obligations in affirming the circuit court's granting of specific performance on a condominium sale).  "A failure, inability, or refusal to carry out the terms of a contract at the time when performance is due will ordinarily be grounds for refusing specific performance." 81A C.J.S. Specific Performance § 80 (2015) (emphasis added).[11]

Thus, in PR Pension Fund v. Nakada, 8 Haw. App. 480,

---

[11]    Determinations of whether a party is ready, willing, and able to perform in this context frequently depend on the purchaser's ability or "financial capability" to make the required payments, because "the willingness of the purchaser is seldom in dispute." 69 Am. Jur. 3d Proof of Facts 99, § 1 (2002).  However, here, the Furuyas' willingness was in dispute, and the circuit court specifically determined that the DROA did not close because the Furuyas decided not to purchase the parking stalls.

490, 809 P.2d 1139, 1145 (1991), in a claim for specific performance of a sale of land through a DROA, the court held the circuit court abused its discretion in granting specific performance, because the plaintiff "failed to prove that Plaintiff was ready, willing, and able to timely close." The court noted that

> [w]here a purchaser seeks specific performance of a land purchase contract, the general rule provides that he must show that (1) he paid the purchase price or tendered it to the seller or (2) he has a good excuse for his failure to so pay or tender and has the readiness, willingness, and ability to pay.

Id. at 488-89, 809 P.2d at 1144-45 (emphasis added). Based on the facts of the case, the court concluded that there was no evidence from which the trial court could conclude the "Plaintiff's ability to pay the purchase price." Id. at 489, 809 P.2d at 1145. In so holding, the court contrasted other cases in which readiness, willingness, and ability to perform were not an issue, because the entirety of the purchase price had been deposited in escrow. Id. at 490-91, 809 P.2d at 1145-46.

Here, the Furuyas never tendered performance, that is, they did not deposit the required funds in escrow to close on the purchase of unit 3206 and the parking stalls ($28,756.85 for the unit plus $459,131.19 for the parking stalls). Thus, in order to maintain their claim for specific performance, the

36

Furuyas had to prove that they were ready, willing, and able to perform throughout the contract term. However, the circuit court found that the Furuyas were not willing to perform during the contract term, specifically noting that "[s]hortly after executing the DROAs, the FURUYAS decided that they did not want to purchase the leased fee interests to the 106 Parking Stalls" and that "[b]ecause of [their] decision" not to purchase the parking stalls, "there was no closing on the sale of the leased fee interests to Apartment 3206 or the 106 Parking Stalls to the FURUYAS."

The circuit court's finding that the deal failed to close because of the Furuyas' decision not to purchase the parking stalls was supported by substantial evidence in the record. As discussed <u>supra</u>, testimony from AOAO's Board members indicated that Furuya informed the Board, as well as AOAO's consultant, Paet, that he no longer wanted to purchase the parking stalls and instead, the Furuyas wanted to sell the leasehold interests in the parking stalls to AOAO. In this vein, the Furuyas' broker, Lum, sent two written offers to AOAO to sell their leasehold interest to the parking stalls to AOAO. The circuit court's conclusion that the Furuyas decided not to purchase the parking stalls is also supported by documentary

37

evidence in the record.  In particular, the Board's November 6, 1996 meeting minutes memorialized the Furuyas' "decision not to purchase the fee interest in the parking"; a letter from AOAO's attorneys to Title Guaranty noted that the Furuyas wanted to purchase "the leased fee interest in Apartment 3206 but not the leased fee interest in the parking stalls"; and a letter from the President of the Board to AOAO condominium owners indicated that "the owner of the 106 parking stalls has decided not to purchase his fee interest from the [AOAO]."

The Furuyas claim that they were ready, willing, and able to close on the purchase of unit 3206 and that the reason the DROA did not close was that AOAO wanted to "control the parking" and realized that it could not sell unit 3206 without selling the appurtenant stalls.  In support, they cite to 1) the 2004 letter from AOAO's attorneys to the Furuyas in which, according to the Furuyas, "[t]he attorney confirmed that it was the AOAO that refused to close the sale"; 2) Craver's deposition testimony that after the Furuyas decided not to close on unit 3206, AOAO realized that the apartment would have to be separated from the parking stalls; and 3) Furuya's testimony that he was ready to deposit the funds in escrow and that the reason he did not do so was that the parking stalls had to be

separated from the unit.  However, the 2004 letter and Craver's testimony appear to address the actions that took place after the Furuyas decided not to purchase the leased fee interest in the parking stalls, during the period when the parties negotiated to attempt to separate the interests in the unit from the interest in the parking stalls.  In addition, despite Furuya's testimony that he did not deposit funds in escrow because the parking stalls needed to be separate from the unit, the circuit court made a finding that the issue of separating the parking stalls from the apartment "was not the reason that prevented the FURUYAS from closing on the sale of the leased fee interests to the apartment unit and the Parking Stalls."  Based on the evidence in the record, this finding was not clearly erroneous.  Moreover, the circuit court's determination was based on its assessment of witness credibility, which we will not second guess on appeal.  See, e.g., Tamashiro v. Control Specialist, Inc., 97 Hawai'i 86, 92, 34 P.3d 16, 22 (2001) ("[T]he credibility of witnesses and the weight to be given their testimony are within the province of the trier of fact and, generally, will not be disturbed on appeal.").

The circuit court's denial of the Furuyas' breach of contract claim is further supported by the principle that "a

39

party who breaches or causes the other party to breach an agreement cannot enforce the agreement to his or her benefit." Stanford Carr Dev. Corp. v. Unity House, Inc., 111 Hawaiʻi 286, 300, 141 P.3d 459, 473 (2006); see also PR Pension Fund, 8 Haw. App. at 491, 809 P.2d at 1146 (noting "a party cannot recover for a breach of contract if he fails to comply with the contract himself" (citation omitted)); cf. Kahili, Inc. v. Yamamoto, 54 Haw. 267, 272, 506 P.2d 9, 12 (1973) ("The general rule is that where a person by his own act makes impossible the performance or the happening of a condition such nonperformance should not relieve him from his obligation under a contract."); Kalinowski, 9 Haw. App. at 478-79, 847 P.2d at 677 ("[N]o person can defend against contractual liability on grounds of a condition precedent when he [or she] is responsible for that condition precedent not being complied with." (second alteration in original) (citation omitted)).  In other words, if a party is responsible for another party's lack of performance, he or she cannot successfully assert a breach of contract claim for damages.

In sum, because—based on the circuit court's findings—the Furuyas failed to demonstrate they were ready, willing, and able to perform on the contract throughout the

contract term, their claim for specific performance fails.

Similarly, because the circuit court found that the Furuyas were

responsible for the failure of the DROA to close, they cannot

prevail on their claim for damages. The fact that the Furuyas

came forward in 2004, approximately seven years after the

initial closing date of the DROA, and stated that they were

ready to close on the DROA and that they had always wanted to

purchase the leased fee interest in unit 3206 along with the

appurtenant stalls was considered and rejected by the circuit

court. Substantial evidence in the record supports the circuit

court's conclusion that prior to the closing of the DROA, the

Furuyas changed their minds and were not prepared to pay the

$459,131.19 for the parking stalls. Accordingly, the Furuyas

have failed to demonstrate error in the circuit court's

decision.[12]

## B. Declaratory Relief, Injunctive Relief, and Ultra Vires Claims

The Furuyas additionally claim that the ICA gravely

erred by determining that the Restated Bylaws did not require

---

[12] As noted supra, the Furuyas argue that there was no separate leased fee interest in unit 3206 and the parking stalls. This argument has no bearing on our conclusion that the Furuyas' claims must fail because they decided not to purchase the parking stalls. Even assuming the Furuyas are correct, their decision not to purchase the parking stalls demonstrated that they were not willing to follow through with the alleged contract, because based on the Furuyas' argument, the DROA for unit 3206 included the appurtenant parking stalls.

AOAO to sell the leased fee interests acquired from the lessor to the condominium unit owners. The Furuyas argue that if AOAO's sending of the DROA to the Furuyas did not constitute an offer, as the ICA held, AOAO never made them an offer to purchase unit 3206, resulting in a violation of the Restated Bylaws. On this basis, the Furuyas maintain that the circuit court's dismissal of its declaratory relief, injunctive relief, and ultra vires claims should be vacated. In response, AOAO reasserts its earlier argument that AOAO's possession of the leased fee interest is not prohibited by its Bylaws or by statute.

Pursuant to Article III, Section 2 of the Restated Bylaws, the Board of Directors "shall have the powers and duties necessary for the administration of the affairs of the Association and may do all acts and things except such as by law, the Declaration or these Bylaws may not be delegated to the Board of Directors by the Apartment Owners." The Restated Bylaws state in relevant part:

> Such powers and duties of the Board of Directors shall include, but shall not be limited to, the following:
>
> . . . .
>
> (m) Purchasing or leasing or otherwise acquiring in the name of the Board of Directors or its nominee, corporate or otherwise, on behalf of all Apartment Owners, any apartments;
>
> . . . .

(s) Implementation of the Acquisition of the Leased Fee Interest in the Land from Lessor.

The Board of Directors shall be authorized and have the power to do all things it deems necessary to enable the Lessor and/or its successors or assigns of the leased fee interest in the land (Lessor) to sell that interest to the Association and/or its members. The Board on behalf of the Association shall be authorized to purchase all or any portion of the Leased Fee interest in the land from the Lessor and is expressly authorized to transact any and all other matters relating to the acquisition specifically but not limited to the following:

. . . .

5. To sell the leased fee interest in the land involving the appurtenant apartment or commercial units, first to the Lessee of the appurtenant apartment or commercial unit and if the leased fee interest in the land is unsold, then to any interested Lessee in the Association or other interested third party by any equitable method of sale as determined in the sole discretion of the Board.

. . . .

7. To incorporate the Association and/or create a Trust to hold title to the leased fee interest in the land so acquired where it is deemed necessary and in the best interest of the Association.

. . . .

In the event that the Association acquires all or any portion of the Leased Fee Interest in the land, the Board of Directors shall be empowered to take all such action as it deems necessary or appropriate to administer the interest so acquired . . . .

The plain language of the Bylaws provide that AOAO can purchase or lease apartments in the name of the Board and has the power and authority "to hold title to the leased fee interest" if "necessary and in the best interest" of AOAO. Here, as discussed supra, the circuit court determined that the

sale of unit 3206 failed to close because of the Furuyas'

decision not to purchase the parking stalls, and after this

decision, the Board decided it would be in its best interest to

retain the leased fee in the parking stalls.  On this basis, the

circuit court determined that AOAO acted "[p]ursuant to [its]

authority and power."  The circuit court further noted: "Nothing

in the By-Laws . . . states that the association of apartment

owners 'must' or 'can only' sell to the lessee after the lessee

declines to purchase their leased fee interest when it is

initially offered by the homeowners' association."  We agree.

Based on the circuit court's finding that the Furuyas decided

not to purchase their leased fee interest, and the language of

the Bylaws, the circuit court's determination was not

erroneous.[13]  Accordingly, the circuit court did not err in

rejecting the Furuyas' related claims for injunctive relief,

declaratory relief, and ultra vires act.

## C.   Promissory Estoppel Claim

Finally, the Furuyas argue that the ICA gravely erred

in holding that the circuit court properly dismissed their

---

[13]    Because we determine that the circuit court did not err based on its determination that the Furuyas chose not to purchase their leased fee interest, we need not determine whether the ICA gravely erred in holding that the Bylaws did not require AOAO to sell the leased fee interest "at all." Furuya, mem. op. at 20.  We additionally note that the Furuyas have failed to demonstrate that AOAO's retention of the leased fee interest resulted in a violation of Hawaiʻi Revised Statutes chapter 514C (1993).

promissory estoppel claim.  The Furuyas claim that the circuit court's justification for dismissing their promissory estoppel claim was inconsistent with the ICA's determination "that no offer was made" by AOAO to sell the parking stalls.  Notwithstanding the ICA's decision, the circuit court's determination that the Furuyas' reliance was not reasonable was not clearly erroneous, and thus, the court properly rejected the Furuyas' claim for promissory estoppel.

In Ravelo v. County of Hawaiʻi, 66 Haw. 194, 201, 658 P.2d 883, 887-88 (1983), this court expressly adopted section 90 of the Restatement (Second) of Contracts (1979), which articulates the doctrine of promissory estoppel as a "Promise Reasonably Inducing Action or Forbearance."  The elements of promissory estoppel include: (1) a promise; (2) at the time the promisor made the promise, the promisor must "foresee that the promisee would rely upon the promise (foreseeability)"; (3) "[t]he promisee does in fact rely upon the promisor's promise"; and (4) "[e]nforcement of the promise is necessary to avoid injustice."  Applications of Herrick, 82 Hawaiʻi 329, 337-38, 922 P.2d 942, 950-51 (1996).  We have also noted that "[t]he 'essence' of promissory estoppel is 'detrimental reliance on a promise.'"  Gonsalves v. Nissan Motor Corp., 100 Hawaiʻi 149,

45

165, 58 P.3d 1196, 1212 (2002) (quoting <u>Ravelo</u>, 66 Haw. at 199, 658 P.2d at 887). Pursuant to the commentary of the Restatement, the reasonableness of the promisee's reliance on the promise is also relevant. Specifically, the commentary notes that a determination as to whether enforcement of the promise is "necessary to avoid injustice . . . may depend on the reasonableness of the promisee's reliance." Restatement (Second) of Contracts § 90 cmt. b (1981).

In the instant case, the circuit court determined that the Furuyas' reliance on the DROA or other "alleged statements" by AOAO was unreasonable given that, inter alia, the Furuyas "voluntarily decided not to purchase the leased fee interest to the Parking Stalls." On this basis, the circuit court dismissed the Furuyas' promissory estoppel claim. The circuit court's findings related to the Furuyas' decision not to purchase the parking stalls, discussed <u>supra</u>, support its conclusion. Put another way, once the Furuyas decided not to purchase the parking stalls, they could no longer reasonably rely on any alleged promise by AOAO to sell the leased fee interest in unit 3206 and/or in the parking stalls. Relatedly, enforcing any alleged promise made by AOAO would not be necessary to avoid injustice, because—based on the circuit court's findings—the

46

Furuyas were responsible for the outcome of which they now complain.  Accordingly, the circuit court properly rejected the Furuyas' promissory estoppel claim.[14]

### V.   Conclusion

For the foregoing reasons, we affirm the ICA's May 30, 2014 Judgment on Appeal.

| | |
|---|---|
| George W. Van Buren, and John B. Shimizu for petitioners-respondents | /s/ Mark E. Recktenwald |
| | /s/ Paula A. Nakayama |
| Matt A. Tsukazaki for respondent-petitioner | /s/ Sabrina S. McKenna |
| | /s/ Richard W. Pollack |
| | /s/ Michael D. Wilson |



---

[14]    The Furuyas also raised a claim of equitable estoppel in their initial complaint, however, no argument on this claim was raised in their application for writ of certiorari.