*** FOR PUBLICATION IN WEST'S HAWAI'I REPORTS AND PACIFIC REPORTER ***

**Electronically Filed
Supreme Court
SCWC-22-0000585
04-SEP-2024
09:50 AM
Dkt. 31 OP**

IN THE SUPREME COURT OF THE STATE OF HAWAI'I

---o0o---

ALPHA, INC.,
Petitioner and Respondent/Appellant-Appellant,

vs.

BOARD OF WATER SUPPLY, CITY AND COUNTY OF HONOLULU,
Respondent and Petitioner/Appellee-Appellee,

and

OFFICE OF ADMINSITRATIVE HEARINGS,
DEPARTMENT OF COMMERCE AND CONSUMER AFFAIRS, STATE OF HAWAI'I,
Respondent/Appellee-Appellee,

and

BEYLIK/ENERGETIC A JV,
Respondent/Appellee-Intervenor-Appellee.

SCWC-22-0000585

CERTIORARI TO THE INTERMEDIATE COURT OF APPEALS
(CAAP-22-0000585; CASE NO. 1CCV-22-0000929)

SEPTEMBER 4, 2024

RECKTENWALD, C.J., McKENNA, EDDINS, GINOZA, AND DEVENS, JJ.,

OPINION OF THE COURT BY EDDINS, J.

**I.**

In this procurement dispute, we examine Hawai'i Revised Statutes §§ 103D-302(b) (2012 & Supp. 2021) and 103D-709(d) (Supp. 2021), two Hawai'i public procurement code laws.

A procuring agency, the Honolulu Board of Water Supply, (BWS) solicitated bids for a multi-million-dollar well-drilling project. It disqualified a bidder. Then it awarded the contract to the project's only other bidder. The ineligible bidder challenged the decision administratively and then judicially. Because the bidder did not have the proper contractor's license, and received no waiver, it lost each time.

Along the way, BWS maintained that the administrative hearings officer and the courts lacked jurisdiction to hear the procurement protest. The challenge should've gone nowhere. We agree.

A bidder who protests a contract award is entitled to a hearing "provided that[] . . . [f]or contracts with an estimated value of $1,000,000 or more, the protest concerns a matter that is equal to no less than ten per cent of the estimated value of the contract." Hawai'i Revised Statutes (HRS) § 103D-709(d)(2). The law's plain words firmly limit who may initiate a procurement appeal. In Hawai'i's public procurement code, there is no prudential consideration - a standing matter possibly waived - to secure review. Rather, the law's ten percent

2

requirement is jurisdictional.  Here, because the bidder could not satisfy the ten percent limit, no jurisdiction existed to initiate an administrative review hearing.

**II.**

In April 2022, the Board of Water Supply posted a solicitation for the construction of three exploratory wells on O'ahu.  The work included a line item for tree trimming and removal.

The solicitation scope of work described BWS's many conditions for clearing on-site vegetation.  The solicitation specified that a C-27 license was required for tree trimming and removal, albeit obliquely.  It said, "[p]rior to removal or trimming of trees *by a contractor with a valid C-27/C-27B license*, a bird nest survey will be conducted by a biologist provided by the BWS."  (Emphasis added.)

The solicitation contained several environmental conditions, including supervision of tree removal by an arborist and bird biologist.  The solicitation asked contractors to minimize movement of plant material to mitigate the spread of invasive plant species.  It also required that the contractor "protect from injury and damage all surrounding trees, plants, etc., and shall leave all in as good as condition as at present."

In May 2022, Alpha, Inc. bid $5.97 million for the work. It bested the only other bidder, Beylik/Energetic A JV (Beylik), by about $7,000. Alpha's bid included $95,000 for tree trimming and removal.

Problems for Alpha surfaced. Alpha had a C-17 excavating license, but not a C-27 landscaping license. Also, Alpha did not name a landscaping subcontractor in its bid. On May 13, 2022, BWS announced it had awarded the contract to Beylik.

On May 17, 2022, BWS sent Alpha a bid rejection letter. BWS's reasoning was faulty. The letter incorrectly stated that bidders did not have to list subcontractors with less than one percent of the work. It also said the tree trimming and removal – worth $95,000 – totaled more than one percent of the bid, and so did not qualify for this purported exception. Thus, Alpha's bid was nonresponsive.

The following day, Alpha sent a bid protest letter to BWS. Alpha argued both that its bid was responsive and that Beylik's bid was nonresponsive because Beylik forgot to include a form. In this letter, Alpha indicated that it would do the tree removal itself and use a subcontractor for the tree trimming. The sub's trimming portion was $6,800, far less than one percent of the bid amount.

That same day, a BWS employee emailed the Contractors License Board (CLB), asking whether a C-17 licensee may remove

4

trees.  A CLB official replied that in one Board member's non-binding opinion, a C-17 licensee may generally perform tree removal.

On June 7, 2022, BWS rejected Alpha's protest.  BWS pointed to HRS § 103D-302(b).  That law says construction bids must list all subcontractors, but that the government entity may waive this requirement if it's in the public's best interest and the missing sub had less than one percent of the work.  Because it didn't list its subcontractor, Alpha flunked this requirement, BWS ruled.  Next, BWS reasoned that waiving the condition was not in the public's best interest - Alpha's bid was just 0.13 percent lower than Beylik's.

BWS also rejected Alpha's position that its C-17 license entitled it to remove trees.  For the well project, BWS cited a determination by the CLB that a C-27 contractor was needed to destroy tree roots without disturbing the surrounding soil in vegetated areas.  The solicitation expressly asked for a C-27 licensee to remove trees.  Alpha had no C-27 license.  Thus, Alpha could not remove trees on its well project, BWS decided.

For these two reasons, BWS disqualified Alpha's proposal.

BWS also rejected Alpha's challenge to Beylik's bid.  It said Alpha lacked standing to attack Beylik's bid, because Alpha was out, disqualified.  On the substance, BWS ruled that Beylik's missing form was immaterial.

5

In June 2022, per HRS § 103D-709(d), Alpha requested an administrative hearing review of BWS's decision. Alpha repeated the arguments it made to BWS.

BWS moved to dismiss. BWS made the ten percent jurisdictional argument it raises before this court.

In July 2022, the Office of Administrative Hearings (OAH) issued its decision. OAH concluded that the ten percent requirement is not jurisdictional and that it had jurisdiction to hear Alpha's appeal.

On the merits, OAH noted that HRS § 103D-302(b) requires construction bidders to list subcontractors (and that BWS's rejection letter got this wrong). OAH also explained that this solicitation demanded a C-27 contractor for the tree removal because of the project's specific ecological needs.

The hearings officer concluded that Alpha could perform some, but not all, of the project's tree-related work. The officer also found that Alpha did not request a waiver of the <1 percent subcontractor listing requirement and BWS, in its discretion, did not grant a waiver. Thus, Alpha's bid was nonresponsive.

Alpha appealed to the circuit court. The parties briefed the issues, and the court held a hearing.

In September 2022, Circuit Court of the First Circuit Judge James Ashford affirmed the OAH and BWS decisions. To do tree

6

removal on the well project, the solicitation reasonably required a C-27 license.  Alpha didn't have a C-27, or list a subcontractor with one.  Given the environmental needs of the project, the court reasoned, BWS could demand a C-27 licensee.  So Alpha's bid was nonresponsive.

The court rejected Alpha's argument that BWS was estopped by statements in its bid rejection letter.  Estoppel requires detrimental reliance.  Because Alpha submitted its bid before the letter, there was no reliance on the letter and no estoppel.

The circuit court opted not to address BWS's argument that the hearings officer lacked jurisdiction to hear Alpha's appeal.

Alpha appealed to the ICA.  It made the same argument there that it makes now.  Alpha could remove the trees itself and was not required to list a tree trimming subcontractor with less than one percent of the contract value.

In December 2023, the ICA published an opinion.  It affirmed.

The ICA read HRS § 103D-302 the same way OAH, the circuit court and BWS did: construction bidders must list all subcontractors, but the procuring agency may waive this requirement if it's in the State's interest and the subs have less than one percent of the work.  The ICA affirmed OAH's and the circuit court's conclusions that (1) BWS did not waive the

listing requirement, and (2) BWS was not estopped from enforcing the requirement.

The ICA addressed the Board of Water Supply's jurisdictional challenge. OAH had jurisdiction to hear Alpha's appeal. HRS § 103D-709(a) confers jurisdiction on OAH to "review and determine de novo, any request from any bidder, offeror, contractor[] . . . aggrieved by a determination of the chief procurement officer, head of a purchasing agency, or a designee of either officer." In the ICA's view, subsection (a) establishes OAH's jurisdiction.

In contrast, the ICA read HRS § 103D-709(d)(2) as a standing rule. That subsection states that any "bidder, offeror, contractor, or person that is a party to a protest of a solicitation . . . may initiate a proceeding under this section; provided that[]" the ten percent limit is met. Because subsection (d) concerns a party's right to bring suit, the ICA believed it relates to standing.

The ICA drew standing's meaning from Tax Found. of Hawai'i v. State: "In Hawai'i state courts, standing is a prudential consideration regarding the 'proper — and properly limited — role of courts in a democratic society' and is not an issue of subject matter jurisdiction." 144 Hawai'i 175, 188, 439 P.3d 127, 140 (2019). The ICA concluded that Alpha satisfied HRS

§ 103D-709(a)'s jurisdiction requirement, and that BWS did not challenge Alpha's standing under HRS § 103D-709(d).

Alpha and BWS filed dueling cert petitions. Both reprised their positions. Alpha appealed its disqualification. BWS appealed the ICA's holding that HRS § 103D-709(d)'s ten percent threshold concerned standing, not jurisdiction. We accepted both sides' certs.

## III.

HRS § 103D's ten percent requirement is jurisdictional and Alpha did not satisfy the requirement. We therefore conclude that the Office of Administrative Hearings and our courts lacked jurisdiction to review BWS's decision.

To provide guidance, we also address the merits of Alpha's appeal. The Board of Water Supply properly disqualified Alpha's bid.

## A. The ten percent requirement is jurisdictional

We first address the ICA's holding that HRS § 103D-709(d)'s ten percent appeal requirement relates to standing, not jurisdiction.

The ICA erred. HRS § 103D-709(d) is not a prudential standing requirement that an administrative hearings officer or court may waive. Rather, the procurement code's ten percent limit is the legislature's jurisdictional command - a fixed and firm threshold to initiate a protest.

9

Statutory interpretation starts with the statute's words. Barker v. Young, 153 Hawai'i 144, 148, 528 P.3d 217, 221 (2023). Our main duty is to determine and advance the legislature's intent. Id. Ambiguity arises when there is more than one plausible textual meaning. Id. To clarify ambiguity, we consider sources outside the text, such as legislative history or the purpose and spirit of the law. Id. Statutory construction doctrines may also aid us. Id. at 149, 528 P.3d at 222.

The ICA used the plain text to reach its conclusion that the ten percent requirement is not jurisdictional. HRS § 103D-709(a) uses the word "jurisdiction." HRS § 103D-709(d) does not. Thus, subsection (d) and its ten percent requirement does not involve jurisdiction. The ICA also flags subsection (d)'s language that limits the parties who "may initiate a proceeding." That sounds like standing, says the ICA.

Here is the text of HRS § 103D-709(a) and (d):

> (a) The several hearings officers appointed by the director of the department of commerce and consumer affairs pursuant to section 26-9(f) shall have jurisdiction to review and determine de novo, any request from any bidder, offeror, contractor, or person aggrieved under section 103D-106, or governmental body aggrieved by a determination of the chief procurement officer, head of a purchasing agency, or a designee of either officer under section 103D-310, 103D-701, or 103D-702.
>
> . . . .
>
> (d) Any bidder, offeror, contractor, or person that is a party to a protest of a solicitation or award of a contract under section 103D-302 or 103D-303 that is decided pursuant

10

to section 103D-701 <u>may initiate a proceeding</u> under this section; <u>provided that</u>:

> (1) For contracts with an estimated value of less than $1,000,000, the protest concerns a matter that is greater than $10,000; or

> (2) <u>For contracts with an estimated value of $1,000,000 or more, the protest concerns a matter that is equal to no less than ten per cent of the estimated value of the contract</u>.

(Emphases added.)

True, because subsection (d) talks about who may initiate a proceeding, it is phrased like a standing requirement. But that does not necessarily make it a standing matter.

<u>Tax Foundation</u> stated that standing often depends on statutes. 144 Hawaiʻi at 188, 439 P.3d at 140. This court has repeatedly ruled that standing requirements may be "prescribed[] by legislative declarations of policy." <u>Id.</u> Thus, "standing requirements can differ based on legislative enactments." <u>Id.</u>

This court considers pertinent statutes to determine standing. <u>Sierra Club v. Dep't of Transp.</u>, 115 Hawaiʻi 299, 319, 167 P.3d 292, 312 (2007). For instance, <u>Tax Foundation</u> held that the common law "injury in fact" test does not apply to declaratory judgment plaintiffs under HRS Chapter 632, because that test conflicts with the legislature's intent in enacting Chapter 632. 144 Hawaiʻi at 188-89, 439 P.3d at 140-41.

Here, the ICA used the wording of HRS § 103D-709 to rule that § 709(d) relates to standing, not jurisdiction. Then it quoted <u>Tax Foundation</u>: "In Hawaiʻi state courts, standing is a

11

prudential consideration regarding the 'proper — and properly limited — role of courts in a democratic society' and is not an issue of subject matter jurisdiction."  144 Hawai'i at 188, 439 P.3d at 140.  Thus, the ICA held that the ten percent requirement is a prudential standing matter.

We are unpersuaded by this reasoning because it contradicts HRS § 103D-709(d)'s text and purpose.  Construed as a prudential standing requirement, HRS § 103D-709 becomes fuzzy, losing its uncomplicated meaning.  Reading HRS § 103D-709(d) as a flexible standing requirement, like the ICA does, creates discord between the prudential nature of standing in Hawai'i courts and subsection (d)'s straightforward ten percent requirement.  The legislature tightly limits procurement appeals involving million-dollar contracts.  Those disputes must involve "no less than ten per cent" of the contract's value.

HRS § 103D-709(d)'s text controls.  The ten percent requirement is firm, not stretchy.  Two reasons support our view that HRS § 103D-709(d)(2) relates to jurisdiction, not standing.

First, the text says so.  There is no carve-out for a hearings officer to waive the ten percent requirement (unlike HRS § 103D-302(b)'s carve-out for an agency to waive the subcontractor listing requirement).  HRS § 103D-709 does not provide for any exceptions.

12

Further, setting an amount-in-controversy minimum is a classic tool to define jurisdiction. Hawai'i's district courts have jurisdiction over civil matters worth less than $40,000. HRS § 604-5 (2016). Otherwise, the matter belongs in a Hawai'i circuit court. HRS § 603-21.5 (2016 & Supp. 2017). Similarly, federal diversity jurisdiction is only available if a party can make a claim for more than $75,000. 28 U.S. Code § 1332. The $75,000 minimum is understood as jurisdictional even though it limits who may bring a diversity suit in federal court.

In Hawai'i, standing typically focuses on the party seeking relief, not on the issues the party wants adjudicated. Citizens for Prot. of N. Kohala Coastline v. Cnty. of Hawai'i, 91 Hawai'i 94, 100, 979 P.2d 1120, 1126 (1999). HRS § 103D-709(d) focuses on both. The section's first part discusses the party. It says a "person that is a party to a protest . . . may initiate a proceeding." But subsection (d)(2) focuses on the issue. It requires that "the protest concerns a matter" worth ten percent. Given the ten percent requirement's straightforward meaning, we are unconvinced that the "may initiate a proceeding" language shifts the requirement from firm jurisdiction to flexible standing.

Second, over the years, the legislature has frequently expressed an intent to streamline procurement award appeals. A hard-and-fast ten percent requirement aligns with that mindset.

13

The legislature's purpose in enacting the ten percent limit was to constrain the number of procurement appeals, thereby allowing the government to procure faster and more cheaply. Other procurement code provisions and legislative history guide our conclusion.

First, a review of the procurement code reveals that the legislature structured the procurement appeal process with speed and finality as the goal. The first two levels of procurement review delay the government's ability to complete the purchase. To start, an unhappy bidder sends a protest to the procuring agency. HRS § 103D-701(a) (2012 & Supp. 2021). The protest pauses the purchase. HRS § 103D-701(f). Next, if a party loses that protest, it may initiate an administrative hearing, subject to the ten percent requirement. HRS § 103D-709(d). The administrative proceeding also stays the procurement. HRS § 103D-709(h).

When a party loses its OAH case, it may seek review in circuit court. HRS § 103D-710(a) (2012). A court case doesn't stay the procurement. HRS § 103D-710(b). But the procurement code expedites the circuit court's review. It mandates that the circuit court schedule the case as expeditiously as practicable. HRS § 103D-710(d). It limits the ability to introduce new evidence outside the administrative record. Id. It directs the circuit court issue a decision within thirty days, or lose

14

jurisdiction.  HRS § 103D-710(e).  A party that loses at the circuit court may appeal to the ICA, where "the appeal shall be given priority."  HRS § 103D-710(f).

Procurement appeals differ from ordinary cases.  The legislature has fast-tracked them.  The reason is simple and practical - the government entity needs to complete its projects without costly delays.  The legislature has often expressed this goal in its committee reports and statements of purpose.

The legislature first enacted HRS § 103D-709 in 2009 as part of a broader procurement code revision.  The legislature's conference committee report identified the main purpose of the late-aughts update: to "expedite Hawai'i's ability to use and benefit from federal economic stimulus funds."  Conf. Comm. Rep. No. 45, in 2009 House Journal, at 1595.  The bill, H.B. 1470 (Act 175), made several changes, all prioritizing speed.  It increased the number of contracts that qualify for expedited small purchase procedures.  Conf. Comm. Rep. No. 45, in 2009 House Journal, at 1596.  It curtailed the timeline for administrative and circuit court review.  Id.  It enacted the ten percent requirement and required protesting parties to pay an appeal bond.  Id.  The procurement appeal provisions were temporary, set to expire in 2011.  Id.

In 2012, the legislature passed H.B. 2265 (Act 173).  It further amended the procurement code.  It also made HRS § 103D-

709(d) permanent.  Conf. Comm. Rep. No. 62-12, in 2012 House Journal, at 1630.  The report stated the bill's purpose: "to make the purchase of goods, services, and construction more efficient for state agencies."  The legislature extended the law beyond the need to quickly use federal stimulus money to help Hawai'i handle a global recession.  Evidently, it liked how HRS § 103D-709 worked.

HRS § 103D-709 has remained untouched since 2012.  Twice, the legislature has amended other parts of Chapter 103D.  In 2019, it added a filing fee to help recoup administrative hearing costs.  The legislature found that, "procurement bid challenges often result in project delays, funding lapses, and project cost increases."  2019 Haw. Sess. Laws Act 73, § 1 at 312.

In 2021, the legislature revised the procurement code again.  It enacted a deadline for agencies to resolve construction and airport contract protests and increased the protest bond for procurement appeals.  2021 Haw. Sess. Laws Act 224, §§ 2, 3 at 813-14.  The legislature found, "the procurement protest review process can be lengthy, causing project delays, thereby increasing project costs that are borne by taxpayers." Id. at § 1 at 813.

Taken together, these findings and enactments show a clear concern with speed, delay, finality, and cost.  The ten percent

limit is itself evidence of this concern. On its face, the limit's purpose is to reduce appeals. The monetary qualifier serves as a jurisdictional limit. Like monetary amounts tend to do.

Our holding squares with how the Office of Administrative Hearings was deciding procurement appeals until Alpha's appeal. Before then, OAH had repeatedly ruled (a) that the ten percent limit is jurisdictional and (b) a sub-ten-percent matter that disqualifies a bidder does not satisfy the limit by putting 100 percent of the amount in controversy. See, e.g., MEI Corp. v. Dep't of Budget and Fiscal Servs., City & Cnty. of Honolulu, Case No. PDH-2019-004 (Haw. Off. Admin. Hearings Sept. 27, 2019) (Hearings Officer's Findings of Fact, Conclusions of Law, and Final Order), at 7-8. As far as we can tell, the Hearings Officer in this case decided for the first time that the ten percent requirement concerns standing, not jurisdiction.

Last, we address the ICA's holding that the Board of Water Supply contested jurisdiction, but failed to challenge Alpha's standing. This ruling is technically accurate, but misses the point. BWS never attacked Alpha's standing *because it argued that the ten percent requirement is jurisdictional*. The whole time, BWS argued that HRS § 103D-709(d)(2) foreclosed Alpha's case. We decline to conclude that BWS waived its argument.

17

**B.   Alpha did not satisfy the ten percent requirement**

Standing or jurisdiction?  Never mind, says Alpha.  It satisfied the ten percent requirement either way.

Alpha argues its protest concerns the responsiveness of its whole bid and its attack against Beylik's entire bid.  If Alpha won its protest, it would receive the contract.  After all, it bid the lowest.  Or, failing that, if Alpha's protest successfully disqualified Beylik, there would be no responsive bidders, and BWS would presumably have to resolicit the contract.  Thus, Alpha insists that its protest concerns a matter worth 100 percent of the contract value, and therefore it satisfied the jurisdictional limit.

BWS views things differently.  Alpha's protest concerns either its failure to list the subcontractor – $6,800 to trim trees, or 0.11 percent of the contract – or its failure to secure a C-27 licensee for all tree trimming and removal – $95,000 or 1.59 percent of the contract.  Either way, Alpha is well below ten percent.

HRS § 103D-709(d)(2) requires that a protest "concerns a matter" worth at least ten percent of the contract's value.  Is the relevant "matter" the small tree trimming and removal line item that got Alpha into trouble?  Or is it 100 percent, because Alpha got disqualified?

18

In this respect, HRS § 103D-709(d)(2)'s ten percent requirement is ambiguous. Evidently, the legislature did not consider how the ten percent limit would apply in a situation where a less-than-ten-percent issue resulted in a disqualified bidder.

To clear up this ambiguity, we use statutory interpretation doctrines. When a law's meaning is unclear, this court considers the "reason and spirit of the law, and the cause which induced the legislature to enact it." HRS § 1-15 (2009). This court may also consider other statutes *in pari materia*, a doctrine that construes ambiguous laws on the same subject matter together. State v. Obrero, 151 Hawai'i 472, 479, 517 P.3d 755, 762 (2022). We do so because "[w]hat is clear in one statute may be called in aid to explain what is doubtful in another." HRS § 1-16 (2009).

Here, Alpha argues the legislature cannot have intended to permit an agency to disqualify a bidder based on a minor flaw without giving the bidder a forum to appeal that putatively unlawful disqualification. We disagree. Given the legislature's oft-expressed dismay about delays caused by procurement appeals, we believe limiting small-scale appeals is exactly what the legislature intended.

Alpha claims an incongruity between the one percent waiver rule and ten percent appeal requirement. Alpha's argument boils

19

down to "how come 1 percent is important for listing a subcontractor, yet 9.9 percent isn't important for appealing?" The answer is the same as the answer to the ten percent jurisdictional question – the legislature has expressed a low tolerance for procurement appeals.

In many ways – protest bonds, expedited timelines for reviews, and the ten percent requirement – the legislature shows that it does not view procurement disputes as ordinary civil litigation.  The legislature seeks to balance the virtues of procurement appeals – rule of law, protecting the public from costly mistakes - against the costs, delay and inefficiency in government purchasing.

Per HRS § 103D-709(d)'s text, purpose, and legislative history, a disqualified bidder cannot sidestep the ten percent requirement.  We hold that a sub-ten-percent matter that disqualifies a bidder does not satisfy the jurisdictional limit by placing 100 percent of the contract amount in controversy. Our decision does not displace existing OAH administrative caselaw holding that bidders may aggregate smaller claims to meet the ten percent threshold.  See Nan, Inc. v. Honolulu Auth. For Rapid Transp., Case No. PDH-2015-004 (Off. Admin. Hearings May 28, 2015) (Hearings Officer's Findings of Fact, Conclusions of Law, and Decision), at 16-18.

Next, we briefly address Alpha's proposed distinction between offensive and defensive procurement appeals. That difference lacks a basis in HRS § 103D-709's language, legislative history, or purpose. It does not alter our reading of the statute's language and meaning.

Last, we note that no party briefed the issue of whether judicial review under HRS § 632-1 (2016) may be available per Alaka'i Na Keiki, Inc. v. Matayoshi, 127 Hawai'i 263, 277 P.3d 988 (2012).

## C.   BWS properly disqualified Alpha's bid

Because we rule that OAH and our courts lacked jurisdiction, we need not resolve the merits of Alpha's bid protest. Due to procurement's public importance and the infrequency of procurement cases in Hawai'i's appellate courts, we exercise our supervisory power under HRS § 602-4 (2016) to provide guidance to lower courts. See also, e.g., State v. David, 141 Hawai'i 315, 327, 409 P.3d 719, 731 (2017) (providing guidance).

Alpha divides the solicitation into two categories of work: tree removal and tree trimming. Alpha argues that its C-17 license entitled it to perform tree removal. And, it says, the principles of estoppel or waiver force BWS to forgive its failure to list its <1 percent C-27 subcontractor.

21

Alpha is wrong on both fronts. BWS may require a C-27 license for tree removal. And BWS had no obligation to waive Alpha's failure to list a subcontractor.

In Alpha's view, the Contractors License Board defines the scope of a C-17 license as a matter of law. A CLB member (in a non-binding email advisory) informed BWS that Alpha's C-17 excavation license covered tree removal. So Alpha may use its C-17 license to remove trees. BWS violated licensure law, Alpha's argument goes, by asking for a more specialized C-27 landscaping license.

Not so. In effect, Alpha asks us to hold as a matter of law that government agencies must always accept the minimum competence for each job. It also asks us to hold that a project's specific needs are inconsequential; the general licensing laws always control. Alpha misses the point of contractor licensing laws. They protect the public from shoddy workmanship. See HRS § 444-4(2) (2013) (the purpose of contractor licensing laws is "protection of the general public"). Licensing doesn't exist to force the government to hire less qualified contractors.

Here, this project's specific ecological needs called for a C-27 contractor. The solicitation included several environmental protection specs: supervision of tree trimming by an arborist and ornithologist, protecting surrounding

22

vegetation, and leaving the site in as good a condition as the contractor found it.  The solicitation asked for a C-27 tree removal and tree trimming license.  Alpha was not entitled to fulfill the work with its C-17 excavation license.

When it procures, a government entity participates in the private market.  Like any private actor, if BWS wants a C-27 certified landscaper to do certain tasks, it may ask for one.  BWS did not usurp the CLB's authority when it specified license requirements for its project.  BWS may enforce its solicitation terms.

Next, BWS had discretion to disqualify Alpha.  Even if Alpha could do the tree removal, it failed to name a tree trimming subcontractor.  HRS § 103D-302(b) is clear:

> If the invitation for bids is for construction, it shall specify that all bids include the name of each person or firm to be engaged by the bidder as a joint contractor or subcontractor in the performance of the contract and the nature and scope of the work to be performed by each. Construction bids that do not comply with this requirement may be accepted if acceptance is in the best interest of the State and the value of the work to be performed by the joint contractor or subcontractor is equal to or less than one per cent of the total bid amount.

On a construction project, listing all subcontractors is mandatory.  Id.  BWS had the option to waive the condition if the work was "equal to or less than one per cent of the total bid amount."  Id.  But BWS chose not to.  It found that excusing Alpha's mistake was not in the county's best interest.  For good

23

reason.  Alpha lacked the proper license and its bid barely beat Beylik's.  BWS could disqualify Alpha.

Waiver and estoppel do not change this calculus.  As the circuit court and ICA rightly noted, the bid rejection letter cannot estop BWS.  Alpha didn't rely on the letter's inaccurate statement.  Alpha submitted a defective bid first, then BWS made the statement.  Because there was no reliance, there can be no estoppel.  Furuya v. Ass'n of Apartment Owners of Pac. Monarch, Inc., 137 Hawai'i 371, 387, 375 P.3d 150, 166 (2016) ("The essence of promissory estoppel is detrimental reliance on a promise.") (cleaned up).

There was also no waiver.  Waiver requires the knowing relinquishment of a right.  Coon v. City & Cnty. of Honolulu, 98 Hawai'i 233, 261, 47 P.3d 348, 376 (2002).  BWS's misstatement was not a knowing waiver.

**IV.**

We reverse the ICA's holding that the ten percent requirement relates to standing, not jurisdiction.  We hold that

HRS § 103D-709(d) is jurisdictional and that Alpha could not satisfy the ten percent requirement.

Jeffrey M. Osterkamp
(Kirk M. Neste on the briefs)
for petitioner and respondent
Alpha Inc.

Joseph A. Stewart
(Stephen G.K. Kaneshiro, Aaron
R. Mun, Moana A. Yost, and Jeff
A. Lau on the briefs)
for respondent and petitioner
Board of Water Supply, City and
County of Honolulu

Lyle S. Hosoda and Spencer J.
Lau (Kourtney H. Wong on the
briefs)
for respondent Beylik/Energetic
A JV

/s/ Mark E. Recktenwald

/s/ Sabrina S. McKenna

/s/ Todd W. Eddins

/s/ Lisa M. Ginoza

/s/ Vladimir P. Devens

